UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| Dana T. Uehara,<br>　　　　Plaintiff,<br><br>v.<br><br>Equifax Information Services, LLC;<br>Experian Information Solutions, Inc.;<br>Nissan Motor Acceptance Company LLC;<br>and DOES 1 through 100 inclusive,<br><br>　　　　Defendants. | §<br>§<br>§   CASE NO. 5:22-cv-156<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

COMES NOW Plaintiff **DANA T. UEHARA** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.* Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2. Defendant Nissan Motor Acceptance Company LLC ("Nissan") is reporting Plaintiff's account with an inaccurate and incomplete payment history on to Experian. In addition, Nissan is inaccurately reporting that the account was included and discharged in bankruptcy to Equifax and Experian.

3. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4. Creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting debt information. Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

5. This was not the intent of Congress when it enacted the Fair Credit Reporting Act.

## JURISDICTION & VENUE

6. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

7. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

8. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

9. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

10. Plaintiff alleges that his Nissan account was for a leased vehicle. Plaintiff alleges he assumed the lease, made each and every payment on time, and paid in full when he returned the vehicle at the end of the lease in or about May of 2020. Therefore, this account was not included in or discharged in his bankruptcy.

11. Plaintiff alleges that Nissan is incompletely and inaccurately reporting the payment history to Experian even though he has timely made all payments since filing his bankruptcy. Further, Nissan is incorrectly reporting the debt as included and discharged in bankruptcy.

12. Plaintiff alleges that it is patently incorrect and misleading for a debt which was assumed and paid in full to be reported on a credit report as if it were included in or discharged in bankruptcy.

13. Plaintiff alleges that it is patently incorrect and misleading for a debt which was paid on time each month to be reported as if it were not or as if it were not verifiable.

14. Plaintiff alleges that if a data furnisher decides to report an account, the FCRA requires complete and accurate reporting; therefore, a data furnisher cannot pick and choose which portions of the account to report. If a data furnisher reports an account, then it should report all portions of that account in a manner which complies with the maximum accuracy and completeness standard of the FCRA.

15. Plaintiff alleges that each and every Defendant is familiar with FCRA requirements and subscribes thereto.

16. Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

17. Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair his Credit Score.

18. In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

19. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    FICO, Inc.**

20. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

21. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.[1]

22. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

23. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. See https://www.myfico.com (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

24. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

25. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

26. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

27. The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

28. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

29. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

30. Each of the five (5) factors is weighted differently by FICO.

31. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

32. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

33. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

34. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

35. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

36. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same

level of severity with respect to their FICO Score and FICO uses the filing date, under both Chapters, to determine how long ago the bankruptcy took place.

37. A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

38. Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.     Metro 2**

39. The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

40. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner.

41. The CDIA's Metro 2 format is commonly used for credit reporting. While CDIA's Metro 2 format is intended to standardize credit reporting, this standard is still subject to the FCRA's requirement of *maximum possible accuracy and completeness.*

42. The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt.

43. The CDIA is experienced in credit reporting. In support of this allegation, Plaintiff avers the following:

    a. The CDIA offers a FCRA certificate program for all CRAs.
    b. The CDIA offers a FCRA awareness program for all CRAs.
    c. The CDIA offers a FCRA certificate program for DFs.
    d. The CDIA offers a FCRA awareness program for DFs.
    e. The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.
    f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.
    g. The CDIA developed a credit reporting resource guide for accurately reporting credit.

44. The CDIA's Metro 2 format is accepted by all CRAs.

45. When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

46. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

47. If the Metro 2 data received by FICO deviates from the FCRA requirements or industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

**C.    e-OSCAR**

48. e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

49. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

50. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

51. When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

52. When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

53. For clarification, an AUD, or other regular transmission, is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

D.  **Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

54. When a consumer files bankruptcy, certain credit reporting industry standards exist.

55. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

56. The Consumer Information Indicator ("CII") is a critical field in the Metro 2 format that indicates a special condition that applies to a specific consumer.

57. Under Metro 2, the CII must be reported on only the consumer to whom the information applies.

58. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

59. In the consumer bankruptcy context, CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed and is active, but no discharge has been entered.

60. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed and is active, but no discharge has been entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a tradeline. Such reporting alerts any potential lender that the account is no longer in a collectable status and is being handled by a Chapter 13 trustee.

61. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed, but the chapter is undesignated/unknown.

62. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

63. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged. In addition, post discharged balances and past due balances should be updated to reflect zero (0) balances. The payment history should also not reflect missed payments moving forward.

64. The CII Metro 2 Code "R" denotes reaffirmation of a debt. In addition, completely reaffirmed debts should report appropriate Account Status and account information as it applies going forward.

65. The CII Metro 2 Code "2A" denotes lease assumption. In addition, assumed leases should report appropriate Account Status and account information as it applies going forward.

66. The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

67. The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

68. Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

69. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

70. The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

71. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

72. The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

73. Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

E. **Plaintiff Filed Bankruptcy and Assumed the Lease**

74. Plaintiff filed a voluntary petition for Chapter 13 bankruptcy on April 25, 2019, in order to repair his creditworthiness and Credit Score.

75. Plaintiff's Chapter 13 Plan is a 100% plan and was confirmed on July 12, 2019.

76. Plaintiff listed the Nissan debt in Schedule G as an executory contract and unexpired lease along with his assumption of said lease.

77. Plaintiff's bankruptcy has not yet been discharged.

**F.   Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

78. On April 16, 2021, Plaintiff ordered an Experian report and an Equifax report to ensure proper reporting by Plaintiff's creditors (the "April 16 Credit Reports").

79. Plaintiff noticed adverse tradelines in his April 16 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

80. Plaintiff then disputed the inaccurate tradelines regarding the Nissan account via certified mail to Equifax and Experian on or about August 16, 2021 (the "Dispute Letters").

81. As to his Experian report, Plaintiff's Dispute Letter specifically put Nissan on notice that, the account was assumed, paid in full, and turned back in at the end of the lease term. As such, it should not be reported as included or discharged in bankruptcy, and the account should reflect the payment history from April 2019 to May 2020.

82. As to his Equifax report, Plaintiff's Dispute Letter specifically put Nissan on notice that, the account was assumed, paid in full, and turned back in at the end of the lease term. As such, it should not be reported as included or discharged in bankruptcy.

83. Plaintiff's Dispute Letters also detailed what was perceived to be problematic about the account.

84. Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

85. Plaintiff is informed and believes that Equifax and Experian both received Plaintiff's Dispute Letters and, in response, sent Plaintiff's disputes to Nissan, as the data furnisher, via an ACDV through e-OSCAR.

86. On October 26, 2021, Plaintiff ordered a second Experian report and Equifax report to determine if his account was updated.

### a. Inaccuracy – Nissan

87. Despite actual knowledge, Nissan continued to report Plaintiff's account, beginning in 290099XXXXX, to Equifax with a current payment status of "Included in Chapter 13" and a comment of "Account involved in Chapter 13 debt". This is patently incorrect as this account was assumed, paid in full, and not discharged in his bankruptcy.

88. Despite actual knowledge, Nissan continued to report Plaintiff's account, beginning in 290099XXXXX, to Experian with a current payment status of "Debt included in or discharged through bankruptcy Chapter 13" and with "D" for "no data" in the payment history for each month from April 2019 through May 2020. In addition, there is an erroneous "BK" for "bankruptcy" reporting in the payment history month of June 2020. This reporting is patently incorrect as this account was assumed, paid in full, and not discharged in his bankruptcy.

89. Plaintiff alleges that Nissan did not investigate whether Plaintiff previously assumed, paid, and fully satisfied the account.

90. Nissan did not update the tradelines to reflect that Plaintiff assumed the debt and paid the account in full.

91. Equifax and Experian both provided notice to Nissan that Plaintiff was disputing the inaccurate and misleading information, but Nissan failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

92. Reporting an assumed account as included in or discharged in bankruptcy is patently incorrect. Reporting no payment history, reporting "D" for "no data", or reporting a "BK" for "bankruptcy", when payments have been made is patently incorrect. In addition, these inaccurate and incomplete tradelines are misleading in a way that can adversely affect credit decisions.

93. Based on Plaintiff's disputes, the assumption of the lease and full payments made on time until the leased vehicle was turned in as agreed, along with its own internal records, Nissan should have known that Plaintiff's account was not discharged due to the assumption, that the account was paid in full, and that Plaintiff had maintained a positive payment history which was not being reported correctly or completely to Experian.

94. Nissan should have updated the CII to "2A" to reflect the lease assumption and should have reported the on-going account details, including the payments made, from that date until the lease term ended.

95. The most basic investigation would include a simple review of internal documentation on the account compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

96. Plaintiff alleges that Nissan did not review if its reporting complied with the FCRA or industry standards for credit reporting, the dispute letters it received from the CRAs, or its own internal records concerning Plaintiff's account.

97. If Nissan reviewed such standards and records, Nissan would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete. At the very least, the investigation would reveal that payments were made on the account, and therefore, those payments should be reported.

98. Nissan should have reported the account to show as closed and paid in full. Further, Nissan should have reported all the payments made on the account in the payment history.

99. By continuing to report Plaintiff's account to Equifax as described in paragraph 87, to Experian as described in paragraph 88, it incorrectly appears to third parties viewing Plaintiff's credit report that he stopped paying the account, and it was included and discharged in his bankruptcy. Further, upon reviewing the Experian report, it appears as if Plaintiff has not made payments in over a year. This makes Defendant's reporting misleading.

100. By reporting Plaintiff's account as described herein, it appears to third parties viewing Plaintiff's credit report that the account was not assumed and paid in full but instead was surrendered and will be discharged, which is patently incorrect.

101. Further, as Nissan's inaccurate reporting is being used to calculate Plaintiff's Credit Score, the credit score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions. Discharged debts are far more injurious to a credit score than a satisfied debt.

102. As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment status and lack of accurate payment history reported by Nissan is effectively lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

103. The lack of investigation and reporting of inaccurate and incomplete information by Nissan is unreasonable.

**G.     Damages**

104.    Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

105.    As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Fair Credit Reporting Act and the power of this Court to preserve his right to a complete and accurate credit report.

106.    Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by Nissan. Plaintiff's reduced creditworthiness, resulting from Nissan's reporting, has caused him to abandon his intentions to apply for certain credit.

107.    Nissan's actions, as alleged herein, are each in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

**FIRST CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))**

**(Against Defendants and Does 1-100)**

108.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     Equifax and Experian Each Failed to Assure Credit Reporting Accuracy**

109.    Equifax and Experian (collectively, the "CRA Defendants") violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

110.    Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the Nissan account as described herein.

111.    Equifax knew, or should have known, (1) that the Nissan account was assumed and paid in full in or about May of 2020, and (2) that the account should not have been reported with a current payment status tradeline of "Included in Chapter 13" and a comment of "Account involved in Chapter 13 debt" on account of the assumption and satisfaction the debt. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

112. Had Experian maintained reasonable procedures to assure maximum accuracy, it would have never reported the Nissan account as described herein.

113. Experian knew, or should have known, (1) that the Nissan account was assumed and paid in full in or about May of 2020, and (2) that the account should not have been reported with a current payment status tradeline of "Debt included in or discharged through bankruptcy Chapter 13" on account of the assumption and satisfaction the debt. In addition, Experian knew, or should have known, that the payment history was incomplete and inaccurate. Further, Experian knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

114. Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers."[2] The investigation and evaluation of Plaintiff's credit worthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the reporting that Experian and Equifax each allowed.

115. As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.    Willful Violations**

116. The CRA Defendants' violations, as described herein, was willful; specifically, the CRA Defendants have intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

117. The CRA Defendants regularly, as a policy, ignore disputes by consumers and fail to perform even a basic investigation regarding the disputes. Additionally, the CRA Defendants regularly fail to forward disputes to data furnishers, thereby frustrating the entire dispute process.

118. To the extent the CRA Defendants do send consumer disputes, they send these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

---

[2] *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019).

119. The CRA Defendants' respective employees receive little to no training concerning how to accurately report consumer debt.

120. Instead, the CRA Defendants' respective employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

121. The CRA Defendants' respective employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

122. The CRA Defendants have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

123. As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

124. The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

125. In the alternative, the CRA Defendants were each negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

126. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from the CRA Defendants in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))

### (Against Defendants and Does 1-100)

127. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  Nissan Failed to Reinvestigate Following Plaintiff's Dispute**

128. Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

129. After Plaintiff assumed the lease, Nissan sent an AUD to Equifax and Experian reporting the account status as included in bankruptcy.

130. After Plaintiff paid the account each month in accordance with the lease assumption, Nissan sent an AUD to Experian reporting the payment history as "D" for "no data".

131. After Plaintiff paid the lease in full in or about May of 2020 and returned the vehicle pursuant to the lease terms, Nissan sent an AUD to Equifax and Experian reporting the debt as included and discharged in bankruptcy. In addition, Nissan sent an AUD to Experian reporting a "BK" for "bankruptcy" in the payment history for the month of June 2020.

132. After receiving the Dispute Letters, Nissan did not correct the payment status or delete the bankruptcy comment on the Equifax report. Instead, Nissan verified and reported the inaccurate payment status and bankruptcy comment via ACDV to Equifax.

133. After receiving the Dispute Letters, Nissan did not correct the payment status or update the inaccurate and incomplete payment history on the Experian report. Instead, Nissan verified and reported the inaccurate payment status and the inaccurate payment history via ACDV to Experian.

134. The account information reported in an AUD or ACDV represents the information of the account at the time of sending the AUD or ACDV, and is not historical prior information. Therefore, the fact that the account may have previously been subject to the bankruptcy, if at all, has no bearing on its current status once the account was assumed and paid in full.

135. Nissan violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

136. Equifax and Experian both provided notice to Nissan that Plaintiff was disputing the inaccurate and misleading information; however, Nissan either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

137. Based on Plaintiff's disputes and review of its internal records on the account, Nissan should have known its account was assumed and paid in full, and ceased its inaccurate reporting.

138. In addition, this inaccurate reporting also adversely affects credit decisions. Discharged debts are much more detrimental to a credit score than a paid debt, with good payment history.

139. Further, payment history, at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a FICO Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported credit score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Nissan's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and his ability to rebuild his Credit Score and obtain new credit.

140. The lack of investigation by Nissan, as required by the FCRA, is unreasonable.

**B.  Willful Violations**

141. Plaintiff alleges that Nissan has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

142. Plaintiff further alleges that Nissan has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, have developed reckless policies and procedures.

143. Plaintiff alleges that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, Nissan's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

144. In the alternative, Nissan was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

**C.  The CRA Defendants Each Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

145. Pursuant to 15 U.S.C. 1681i(a)(1), the CRA Defendants were required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's disputes regarding the Nissan account.

146. Thus, the CRA Defendants each failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

147. The CRA Defendants are not passive entities bound to report whatever information a data furnisher provides.

148. Plaintiff alleges the CRA Defendants are readily familiar with FCRA requirements and credit reporting industry standards.

149. Based on the foregoing, Plaintiff alleges that the CRA Defendants can, and do, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

150. The CRA Defendants can and do instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

151. Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that Nissan was not reporting its account at issue correctly.

152. Had Equifax conducted a proper investigation, it could have closed or bookended the Nissan debt by adding a notation on the credit report to show that the debt was in fact assumed and paid in full. However, Equifax continued to report the account as described herein.

153. Experian failed to conduct a reasonable investigation because any basic investigation would have uncovered that Nissan was not reporting its account at issue correctly.

154. Had Experian conducted a proper investigation, it could have closed or bookended the Nissan debt by adding a notation on the credit report to show that the debt was in fact assumed and paid in full. However, Experian continued to report the account as described herein.

155. The CRA Defendants, therefore, did not conduct even the most basic investigation regarding the requirements set forth in the FCRA or credit reporting industry standards, otherwise the aforementioned would have been uncovered.

156. In the alternative, Plaintiff alleges that the CRA Defendants did not send an ACDV to Nissan to confirm accurate reporting on its account. Despite receiving the Dispute Letters providing notice of the inaccuracies, the CRA Defendants did not delete or correct the tradelines or conduct an investigation.

157. In the alternative, if the CRA Defendants deemed Plaintiff's Dispute Letters "frivolous or irrelevant" under 15 U.S.C. 1681i(a)(3), the CRA Defendants failed to notify Plaintiff of such determination as required by 15 U.S.C. 1681i(a)(3)(B). As Plaintiff received no such notice from the CRA Defendants, Plaintiff alleges the CRA Defendants deemed his Dispute Letters valid, and thus triggered its obligations under 15 U.S.C. 1681i(a)(1) and (2)(A), for which they did not comply.

## THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants and Does 1-100)

158. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   The CRA Defendants Each Failed to Review and Consider all Relevant Information**

159. The CRA Defendants each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

160. The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.   Willful Violations**

161. The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

162. In the alternative, the CRA Defendants were each negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

163. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from the CRA Defendants' in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendants and Does 1-100)

164. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   The CRA Defendants Each Failed to Delete Disputed and Inaccurate Information**

165. The CRA Defendants each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

166. The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

B. **Willful Violations**

167. The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

168. In the alternative, the CRA Defendants were each negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

169. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### PRAYER FOR RELIEF

170. WHEREFORE, Plaintiff prays for judgment as follows:

a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e. For determination by the Court that Defendants' policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

f. For determination by the Court that Defendants' policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: February 22, 2022

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorneys for Plaintiff

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial of this matter by jury.

                                                **SCHUMACHER LANE PLLC**

Dated: February 22, 2022                       */s/ Kyle Schumacher*
                                                              Kyle Schumacher
                                                              Attorneys for Plaintiff